This Honorable Appellate Court of the 3rd District of the State of Illinois is now in session. The Honorable Mary Kay O'Brien, Rebecca. Okay, you may be seated. The court will call the next case. 321-01-00, Sir Peterson, a panel by Stephen Greenberg v. the Board of Trustees of the Bolingbrook Police Pension Fund, acted by Richard Greenberg. Mr. Greenberg, if you may proceed as you're approaching. I just would like to welcome the Will County Extern Program. We're all students just completed their first year and have been working for three weeks for the Circuit Court of Will County. They are accompanied by Judge Diana Archambault, so we really are glad to have them. And thank you all for being here for our first in-person oral autographs in a long time. And our two newest Justices, although they're not that new, Justice Dougherty and Justice Hoffman. And so, with that, we can see that we really are glad to be back. Now that you've put all the pressure on. Your Honor, good morning. It's kind of interesting. So this is the first oral argument. This is actually the third time I've been before this court to argue on behalf of Mr. Peterson. More than a decade ago, I think we did the first televised proceeding in Illinois in this courtroom, which was Mr. Peterson's initial appellate argument before his trial. So I have to tell you that I'm well familiar with the facts of Mr. Peterson's case, having represented him on appeal a number of times, having sat through the trial and so forth. And I can tell you that we're accepting for purposes of everything that he committed this crime, that he killed Kathleen Savio. With that, it's a strictly personal matter. It was somebody who killed their wife, who was going through a divorce, or had gone through a divorce, actually. They were supposed to have a bifurcated proceeding with the property settlement to come. It had nothing to do with his being a police officer. The pension board has taken away his pension because they have come up with a list. And if you look at what they've done, if you look at their initial decision that they reached, there's a whole bunch of things that they said were connected to his being a police officer. Then before the circuit court, that list became much shorter. And finally, before this court, it's become even shorter. There should be no list at all because there is no connection between his service as a police officer and anything about this murder. They point to things like, well, the state troopers decided to interview him at the Bolingbrook police station instead of at the state trooper station, which my understanding is a little, basically a two-room office by the Joliet Penitentiary, by Stateville Penitentiary. They didn't interview anybody at that office in connection with this investigation. They interviewed people in their houses. They interviewed them at the police station. They interviewed them at a restaurant and so forth. And the testimony was that the state police investigators talked. One wanted to do it at Peterson's house. The other one wanted to do it at the state police headquarters. And they compromised and said, we'll do it at the Bolingbrook police station. That has nothing to do with his being a police officer that they decided to interview him there. They talk about the crime scene and how only a police officer would know how to do things at the crime scene. And at one point they talk about how he knew because he was a police officer how to contaminate the crime scene. And another, they said, he knew because he was a police officer how not to contaminate the crime scene. They say that he planted a tub. Savio's drowned. Apparently she's in the tub. When the police first go there, no one remembered seeing a bathtub. And then all of a sudden there was a bathtub. So they said, oh, he must have planted the bathtub because he knew that it was missing and he'd overheard people talking about it. It trialed. The state tried to put that evidence in. And the judge said, no, there's no evidence Peterson was there. There's no evidence he was in the house. There's no evidence he was upstairs at all when any of that took place. So the issue, though, become in terms of, you know, when they decide to interview Stacy Peterson, that he says as a matter of professional courtesy, I'd like to be in the interview. Isn't that, you know, the problem is that, you know, the only way you get to use that type of courtesy or to make that request is because you're a police officer. And, you know, him even apparently saying, you know, be careful with this. This is my wife upstairs when the first responders come in. I mean, nobody else, you know, just random person wouldn't be able to say that. I mean, he used the stature of his position to be in the interview with his wife and to, you know, even to call the locksmith. I mean, to do those kind of things that a regular person would have to call 9-1-1 and say, go through Mr. Morris, go get a locksmith here. But he was able to short circuit some of that stuff. Okay. So first of all, he owned the house. So he had every right to call a locksmith to go into the house. It wasn't some stranger's house or anything like that. And the locksmith didn't say he testified. He said, I was doing this for Peterson because Peterson used me on his other businesses. And I had a relationship with him as his locksmith. There was never any testimony that going into the house was because he was a police officer. In fact, what the board says is that he didn't follow the procedures that a police officer should have followed when it came to the locksmith. So they're saying he didn't do what he should have done as a police officer when it came to the locksmith. As far as saying, be respectful, this is my ex-wife. I don't know how that's taking advantage of the fact that you're a police officer. He would say, be respectful of the body. This is my ex-wife. That's something, hey, be ginger with the body. Be careful with the body. Hey, this is, you know, my ex. I don't think you can parse that into him being a police officer. Now, you also brought up the statement that, hey, a little professional courtesy so he could sit in for Stacy. So that's very interesting. The testimony in that was he said something to that effect. It wasn't those exact words, but it was to that effect that we've all used those words because that was how it was summarized. The state police investigator said that they saw him as a concerned husband, a concerned father, that they let him sit in as a concerned husband, as a concerned father, that he said nothing to influence the interview, that he did nothing to influence the interview. So, again, I guess the question that comes to play here is, are we looking at someone's status as a police officer, or are we looking at did they really use that position to commit a crime, and where do you draw the line? So I get in an argument with my wife, and my wife always says to me that I'm lawyering her. Okay? Every time we get in an argument. I mean, I can say two words, and she's like, you're playing the lawyer with me. I mean, this is who I am. She may perceive it that way because that's how she sees me. That's how she knows me. You know, someone may say to each of you at some point, you're judging me. Does that mean that they're seeing you as a judge and you're acting as a judge? Mr. Greenberg, do you agree that the relationship between his police officer career, et cetera, that the board found to be sufficient to this crime is a question of fact? I think it's de novo review. There's all facts, but the facts that are found, and wouldn't the relationship be a factual finding based on the circumstances? Well, there's no doubt that he has a relationship, that he's a police officer. What the board has cited is their facts to show that he used his position as a police officer is unsupported by the record. For instance, they have in there that they found that he used an armbar to put her in the tub and to drown her. All of the evidence in this record is that while he has a certificate that says he went to a train course and one of the things generally taught is an armbar, then no armbar was used. In fact, that again was not allowed at the trial. And I understand that you're arguing that the record doesn't support those factual findings, but the question is the determination by the board, which we're reviewing, isn't the determination that there was the relationship, even though you disagree with that, a factual question? And your argument is there are no facts there, therefore they've abused their discretion on factual findings. Yeah, I'm saying that I believe the standard is the manifest weight of the evidence and that on review, that's the standard for this court to use, and that if you use that standard of review, there is no evidence. Right. That the record simply does not support the things that the board has found. So would you agree that then circumstantially, and I don't mean to take a lot of your time, but take all the time you want. That circumstantially, on a scale of like 1 to 10, that the board doesn't need to find a direct connection, being a 10, to the police officer committing the crime in order to determine that he's not entitled to his pension, but some, and the issue then is where does some fall on the scale of 1 to 10? Does it have to be 0, and therefore he's entitled to it? Or if the board finds that there's some connection to his police officer training, experience, whatever, is that enough to deprive him of his pension? I would say that it has to be a 10, and the reason I would say that is because otherwise you're talking about his status as a police officer. So you could take any crime, as the board did here, and say that a police officer would know better how to commit this crime because he's investigated that kind of crime. You could say a police officer shoplifts, okay? You could say that the police officer knew how to conceal the item because he's dealt with shoplifters. You could, a police officer, you know, flees from the scene of an accident. You could say a police officer fled from the scene of an accident because he knew that the cops would come investigate the accident. In other words, you could say that about everything, and I think that's what the law says you don't have to do. They could have, when they have this statute, the legislature could have said, as they have in other areas of public employment, if you get convicted of a felony, you are not entitled to your pension. There are other divestiture statutes that have that, and I think we've identified them, if I recall, in our original brief. They haven't said that. They have said that there has to be a causal connection between them, so almost like a proximate cause kind of thing. What about your being a police officer made this crime? What did you use to do this crime? And at one point, you know, if you look, you can look at the Cullen case where he took out his gun and he shot somebody right between the eyes, and the court said that that was him. Surely he was at that insurance. That's where the point comes in about the question of fact. You have different juries that make different determinations of fact. You have different boards that find different factual issues. That board found that that was not factually related to his service as a police officer. This board, in your case, finds that his service was related. Right, but they have to point to real facts that existed in the case. They have to point to something that shows that, and that's where they haven't done here, what they haven't done here. The facts they point to, many, many of the facts they point to aren't there. They don't exist. They were never found. They were never presented. They were never heard. They're just simply made up, and the ones they do point to are common to everybody, every single police officer. They're nothing that distinguishes. and shows that he really used this specialized knowledge, this special skill, whatever it was, to commit the crime. And you have to remember, he wasn't on duty at the time this crime was committed. So you can't say he did it while he was working as a police officer. So what did he do? Drowning? Anyone can drown somebody. You don't need any special knowledge of that. What is there? And that's, I think, where the problem is. I understand that these boards, these are appointed boards by the villages. I understand there's a certain expediency and appearance, and giving a pension to somebody who's serving time for murder is not the most popular thing to do. But they had an obligation to identify, and they still haven't identified specific facts, and say, look, he employed his skill as a police officer in this manner. And if you look at their decision, in a lot of places, they talk about stuff, and then they say, we're going to infer from this. Again, the towel is the perfect example. There's zero evidence that he planted a towel. The trial judge would not allow the prosecutors to argue that. And we've included the quote from the judge, that it's utter and complete speculation. Yet the board, reading a cold record, and only part of the cold record, says, well, we're going to infer that he did it. Well, where's the evidence he did it? You still need some evidence. I see my red light. Just one question, Mr. Greenberg. The court allowed the testimony of Mr. Pachter, if I'm pronouncing that correct? Yes. At the criminal trial? Yes. And the board took that into consideration as well? Yes. Didn't that show some sort of malicious intent? I mean, this was on a write-around as well, apparently. Right. If you believe it took place. I mean, we've addressed all the reasons why we don't think Mr. Pachter was, that the write-around ever took place, including the Bolingbroke police could not find any record of it, which was required. And then if you look at it, again. If someone had some malicious intent, they wouldn't necessarily record it, would they? That's true. And then you look at the fact that it was a year before anything happened. There's no follow-up. There's no call. There's no anything. Hey, can you do this or anything like that? And then Pachter, when he makes this allegation, he doesn't go to the police. It's six months after the whole thing blows up with Stacy, and he goes on national TV and so forth, right after Drew wouldn't give him money or loan him money. That's also a separate incident. That was admitted at the criminal trial to show intent. So I understand that. But it also is, was other crimes evidence, so to speak. So it's separate from this incident. It may have been admitted at the trial, but I think that it's an entirely separate event. And, in fact, factually, we know it didn't happen. So he couldn't have, it can't be said to have been part of this crime. Might have been wishful thinking at one point, but you can't say that it's factually connected. Thank you. Thank you. Thank you, Mr. Greenberg. Mr. Greenberg. Your Honor, this may please the Court. Mr. Greenberg, first of all, I have to not surprisingly disagree with my colleague. The fact that he asserts that this is a private matter is absolutely not supported by the record. What takes this out of the private husband and wife murder, I hate to say common variety murder, is this is a police officer. And I point out, at no time has my client, the Bolingbroke Police Pension Board, ever contended that just because he was a police officer or he somehow violated his oath of office, which is prohibited, as you know, under the case law, we've never made that contention. It only said that there's a nexus there. This is a man that would receive a public pension had his felony not caused him to be divested of that. Police officers in Illinois contribute only 10% to their pension. The rest is paid by us as taxpayers. That and investment income. So that takes this totally out. Let's address the issue of he wasn't on duty. Well, the case law says he doesn't have to be on duty. And you're going to hear me refer to a case called Abadi v. Retirement Board of the Police Continuity and Benefit Fund of Chicago. It was cited as a Rule 23 opinion in my initial brief. Fortunately, the court granted my motion to publish that and it was published a week ago today. So that's now good law. And I would point out that nowhere in the statute does the pension board have to prove there's a smoking gun. They don't have to prove to Justice Doherty's comments. I don't think it has to be on a scale of 1 to 10. This is not retrying the criminal case. This is not the board game clue where we have to show he killed her with a – Colonel Mustard killed her with a candlestick in the library. All the board has to do is convene evidentiary hearings, rely on evidence, establish evidence to the record that you as justices can review to find out whether the board's decision was clearly erroneous, which I believe is the standard. I don't believe it's the manifest waste standard. I think if you look at the Abadi case, which, again, was cited as a Rule 23 in my initial brief, now a published decision makes it clear that it's a two-step analysis. First, there's a factual determination to determine what the facts are. So as counsel pointed out, the fact that Pasteur allegedly was solicited to commit Stacy's – I'm sorry, Ms. Savio's murder, that, quite frankly, is a question of fact. It's left up to the members of the administrative agency as triars of fact. So I think that's something I hope that you don't focus on. Focus on the big picture. Let's talk about what is required. He has to somehow have what we abbreviate, I think, as a service-related felony, that the felony arose out of, was in connection with, or resulted from his service as a police officer. Abadi is a great case because Abadi addresses just about every issue and every argument that's raised here. And I would ask you to take a look at Abadi and the facts and note that the facts and the arguments raised by Peterson here are strikingly similar. So like Abadi, Peterson contends that the Cullen case, the Siwat case, shouldn't dictate a conclusion that there was no nexus. Similarly, like Abadi, Peterson contends that the pension board only relied on bits and pieces of evidence or cherry-picked apart the record. Like Abadi, Peterson contends that the board failed to support its conclusions that the felony was somehow, there was a nexus, or it was service-related, as I referred to earlier. And like Abadi, Peterson urges his court to look only at cases interpreting Section 2-5-227, which is the equivalent felony divestiture provision in Article 3 that's at issue here, which is 3-147. And quite frankly, in Abadi, the First District Appellate Court soundly rejected each and every one of those arguments. And the takeaways, in my judgment, from Abadi are I don't think they can be ignored. That's obviously what the justices do here. But first of all, they looked at the tests. So what are the legal standards that have to be demonstrated by the pension board? And there's a number of tests. And the Abadi court concluded it can be the but-for test, it can be the substantial factor test, or it can be the in some way. And the court in Abadi said, you're not limited. All you have to do is use one of these tests to determine whether or not there's a nexus. And quite frankly, the board did that. They analyzed the facts of the case and applied those tests and came to the ultimate conclusion that this was a service-related felony. With respect to the findings, this is also, I think, a very important takeaway from Abadi. The argument was made that the board didn't support its conclusions because it had insufficient factual findings. What the appellate court in Abadi said was, you don't have to unless a statutory requirement is contained in that statute. It's not. It's virtually the same. Section 3147 that should apply to Mr. Peterson's case is virtually identical to the one that applies to So the bottom line is, what the court said is, all you have to do is look at the totality of the evidence, and even if specific factual findings weren't made, that is sufficient as long as you as justices on review have an evidentiary record that you can base your decision on that would justify what the action my client took. So the bottom line is, the other takeaways is, you don't look at the crime, the felony for which Mr. Peter was convicted, which as we know was the homicide of Kathleen Savio. You are able to look before, during, and after, and that was a specific holding in Abadi that was also supported by some of the other cases discussed in both parties' brief, that you're not confined to just the moment of the felony. One court said, we don't look at the felony in a vacuum, and we don't look at the evidence in a vacuum. We're allowed to look at conduct before, during, and after. If you recall, Abadi was a press case. It was the Chicago police officer that was off duty. He was in a bar. He lost his pension because of his conduct when the board analyzed before, during, and after. The same thing this Bolingbroke Police Pension Board is asking you to do here. Let's talk about the conduct before. Conduct before, as one of the justices mentioned, he asked for professional courtesy. I've been a police officer. My son's a police officer. Professional courtesy is not granted to lawyers. It's something that he asked for, that only a police officer could ask for, and only another police officer would give him. Secondly, he asked for professional courtesy when the Bolingbroke Fire Department responded. He did make statements, and the board didn't hold that against him. He made a statement requesting professional courtesy. What else do we have? We have, as was mentioned earlier, Mr. Packer. He does a ride-along. He essentially commits solicitation to commit murder. That's a piece of evidence the board is allowed to consider. The night of the discovery of Savio's body, he's on duty. He's in uniform. He's the sergeant on duty. He knows full well he's engaged in a bitter divorce with his wife. He should know better if there's a well-being check. He bypasses the rules and regulations. He knew that as a police officer. And yet, afterwards, the board also looked at specialized police knowledge. And that's an important case, an important concept, because he had a great amount of specialized police training, interviews and interrogation techniques, crime scene, evidence-related matters. At the time, Mr. Peterson had quite a bit of professional training. And actually, there's a case that really addresses this point that was relied upon and given some consideration by the Abadi court again, which is Sidewick. And what Sidewick said was, but for the fact that this officer had, it was an undercover drug buy where the police officer was buying illegal narcotics. And essentially what the court said is, we use logic that this officer had specialized knowledge, and the court actually said logic compels us, compels us, to find that he used his specialized knowledge and training. It's the same thing that happened in this case. Mr. Peterson had all that specialized knowledge. So you don't view the evidence in a vacuum, and you don't review the felony in a vacuum. And that's been affirmed. The evidence here, all of the evidence, my colleague says, well, you know, we made it up. Everything that was relied upon was cited as a finding in the board's final decision or on remand was based on either testimony from the criminal trial, subject cross-examination, testimony at the pension board hearing, documentary evidence. Now, it's true we didn't retry the criminal case. And I think it's fair to say that the court cases don't require you to, because the theory is, as I understand it, because the felony divestiture is cloaked with all the elements of due process, you don't have to reinvent the wheel. As long as you bring the transcripts in, as long as you bring the evidence in, if you have live witnesses, we did all that. The board bent over backwards to be fair to Mr. Peterson. And in fairness, I don't think Mr. Greenberg is allowing or arguing that there was somehow a due process violation. They hired an independent attorney to present evidence just to maintain that cloak of fair impartiality. Unfortunately, they didn't vote the way Mr. Peterson wanted him to vote. And for those reasons, I'd be happy to answer any questions, but for the reasons that I've argued here today as well as the reasons set forth in my brief, I respectfully request that you affirm the decision of the pension board as well as the trial court. Just one quick question. On the standard for the divestiture, is it your position that under a body that some relationship to the police service is sufficient for the board decision to be upheld? Yes, Your Honor, I believe that that is it. I think that's supported by the case law. It's either but for, it's either in some way, and there's actually some of the cases cited in our brief even uses that language, in some way, but for. But I think DeVoney, the Supreme Court, tells us there has to be a nexus. And I believe based on all the cases, the facts that we've argued, we've asserted the board has met their burden, and there is a nexus between Peterson's service as a police officer, not just his status, that's never, ever been a contention, and it will be found nowhere in the board's decision order. Thank you.  Thank you, Mr. Riemer. Mr. Riemer, for your comment. Thank you. When I was up here before, I said something about, you know, this is a political board and so forth. I think it's interesting when Mr. Riemer points out that the police officers only contribute 10% to the pension, and the rest is paid by taxpayers. That's really not an issue here. That's really kind of irrelevant. But that's what I feel like sort of underlies the decision here. You've got these three tests, and I agree that the courts have said the three tests, the but-for, the substantial factor, and the in some way. But, again, there's nothing that shows how any of those, under any of those tests, his position or service as a police officer was related. A body is so fundamentally different. A body was in a bar, drunk, and he beat up the bartender. He was telling everybody he could get away with anything because he was a Chicago police officer. He had gotten away with things before because he was a Chicago police officer. That federal jury before Judge St. Eve made a specific finding that he was able to do this because he was a Chicago police officer. It was a Monell claim, and Monell claims are where they talk about pattern and practice, and that jury specifically found that there was a pattern of practice of sort of sweeping things under the rug, and that's why a body was in that position that night, because he had previously been able to get away with that stuff. Not only that, but he went back along with colleagues from the police department who were on duty. They tried to get the videotape of the incident. They threatened to charge others who were witnesses with crimes. I mean, a body is so fundamentally different from this particular case that we have now. They couldn't be any more different. Had Peterson actually said, I am a police officer, and, you know, you guys can't go in there and investigate, and then walked in the house and done stuff, I get it. That would be a body, but that's not what happened here. The biggest reach, I was just looking back. So probably the biggest reach, and this shows just how far this board went to try and find against Peterson, and I think it undercuts the veracity of their entire decision. There was a situation where years later, he was, Peterson was in California with Stacy. Stacy's now his wife. And he has a conversation there where something happens, you know, between me and my wife, and Savio's deceased at this point. Something happens between me and my wife, and I'm just going to kill myself. And they say, well, you know, you shouldn't do that. I'll just kill her. And everyone agrees it's joking, but he's talking about Stacy. He's not talking about Savio. Yet the board cites that as evidence he used his position. Everything is, I'm surprised the decision doesn't say that Peterson woke up on the day of the murder and took a breath of the air in Bolingbrook, which he was able to do because he helped keep the community safe as a police officer, and say that's connected. I mean, every single thing this guy did, they found was connected. Every single thing he didn't do, they found was connected. And I ask myself as I look at this each time, what could he have done differently? What could he honestly have done differently? Said nothing? Done nothing? Said nothing? They'd say, as a police officer, he knows that you should be silent. And, you know, the old saying, he who doesn't talk walks, is the old saying. As a, well, he just stood there, making it difficult for the officers to observe whether there were any marks on his body. As a police officer, they knew that, you know, he knew that they were going to look at his body. I mean, every single thing he did, so he could do no right, no matter what he did. They took every single event that occurred over that time period and said, copper, motivated by being a cop, killed her. That was because he was a cop. They said he killed her because he didn't want to share his pension. Only would have a police officer's pension if you're a police officer. There's the nexus. I mean, every single thing he did. So I'm asking that you look at this objectively, which is what I think this panel is required to do under the law, and you will see that this is a run-of-the-mill, spousal killing. Any other questions? Thank you, Mr. Greenberg. Thank you both for your arguments here today. This matter will be taken under advisement, and a written decision will be issued to you as soon as possible. Right now, we'll take a quick assessment panel change.